Ray v. Thompson, Adm'r.

Let the judgment of the court below be affirmed, at the appellant's costs.

---

## RAY *vs.* THOMPSON, ADM'R.

[BILL IN EQUITY BY JUDGMENT CREDITOR, TO SET UP AND ENFORCE A LIEN ON THE LANDS OF THE ESTATE OF A DECEASED AND INSOLVENT DEBTOR.]

1. *Liens of judgments, &c., given by enactment of 10th of December, 1861; how far repealed by adoption of the Revised Code.*—The liens of judgments, decrees, and forfeited bonds, given by the enactment of December, 1861, are repealed by the adoption of the Revised Code, except so far as the same are preserved and re-enacted in this Code.

2. *Lien of judgment defined; how may be taken away.*—The lien of a judgment is a qualified right, given by law, and it may be taken away by law; and when the law is repealed, upon which the lien depends, the lien is destroyed by the repeal, unless excepted out of it.

3. *Claims at law in contra-distinction to equitable claims, against decedent's estate; what subject to.*—All claims at law, in contra-distinction to equitable claims, against a decedent's estate, except preferred claims, stand upon the same footing, and are all subject to be barred by failure to

present them to the representative, as required by law, or by the statute of non-claim, upon the insolvency of such estate.

4. *Insolvency of decedent's estate ; lien of judgment, how affected by.*—By the insolvency of a decedent's estate, legally ascertained, the lien of a judgment created by law against such estate, is dissolved.

5. *Same.*—The effect of a decree of insolvency, in such a case, is to transfer to the court of probate the exclusive jurisdiction of all claims against such estate, and upon final settlement of such insolvent estate, the court has full power to adjust them, when they are merely demands at law.

6. *Same ; bill in chancery after insolvency, to enforce lien of judgment at law, devoid of equity.*—A bill in chancery, filed to enforce the lien of a judgment at law merely, after the death of the defendant therein and the insolvency of his estate, is devoid of equity.

7. *"Act to regulate judicial proceedings," approved December 10th, 1861 ; invalidity of.*—The act of the rebel general assembly, known as an act to regulate judicial proceedings, and purporting to have been approved on the 10th day of December, 1861, is invalid ; because it was passed by a legislature which "constituted one of the departments of a State government established in hostility to the constitution of the United States ; and it has not been re-enacted or adopted by the rightful government of the State, since its restoration to the Union." (Per PETERS, J.)

8. *Same.*—Said act is also invalid, because it shows on its face that it was made with a view to force the circulation of the "bonds and treasury-notes of the so-called Confederate States of America" upon the people of this State, for the purpose of aiding the prosecution of the war of the late rebellion against the government of the United States. (Per PETERS, J.)

9. *Quere ?*—Can the judgments of the courts of the rebel government of the State of Alabama be made valid, as judgments, by the legislature of the rightful State government, after its restoration to the Union ? (Per PETERS, J.)

APPEAL from the Chancery Court of Macon.
Heard before the Hon. N. W. COCKE.

THIS was a bill in equity, filed by a judgment creditor, to set upon and enforce a lien upon the lands of a deceased debtor, whose estate had only been duly declared insolvent.

The facts upon which this case turns, are the following : Ray, the appellant, on the 12th September, 1863, obtained judgment against H. H. Hicks, in the Macon circuit court, in this State, for $2,000 debt, and $266 interest and costs of suit. Execution was issued thereon, on the 12th October, 1863, for interest and costs due on said judgment,

which was delivered on the 13th of October, 1863, to the sheriff of said county. The sheriff kept this execution till March the 12th, 1864, and then returned it, indorsed " Returned by order of the plaintiff's attorney, this 2d March, 1864." No part of said judgment has ever been paid, and it remains in full force and unsatisfied. Shortly after said execution was returned, said Hicks died in said county of Macon, leaving a will, which was proven and admitted to record, and letters of administration on his estate were granted to Benjamin Thompson, the appellee. On several occasions Thompson promised to pay and satisfy said judgment, but wholly failed to do so. At the date of the rendition of said judgment, Hicks owned and possessed the tract of land named in the bill, containing 2,281 25-100 acres, and he continued seized thereof up to his death. The bill alleges that said judgment was a lien on said lands, and asks that the same be enforced by decree of the court. The widow and children, and administrator of Hicks, are made parties defendant to the bill.

The answer of the administrator and proofs show that Hicks' estate had been duly declared insolvent. The answer also interposes a demurrer to the bill for want of equity, and a plea that said judgment had not been filed as a claim against an insolvent estate, and that it was consequently barred. It does not appear that said judgment had ever been presented to said administrator, or filed in the office of the probate judge, as required by law. Upon the hearing, the chancellor dismissed the bill and taxed the complainant, Ray, with the costs. And Ray now brings the case to this court, and assigns the decree of the chancellor for error.

CHILTON & THORINGTON, for appellee.—1. The judgment in this case was rendered after the passage of the act of 10th of October, 1861, by the 1st section of which act, it is provided * * * that " all judgments rendered hereafter * * shall be liens on all the property of the parties against whom such judgments have been, or shall be rendered, which is now subject to levy and sale, except the crops of such parties, and such property as is con-

sumable in its use, including every description of live stock. And no lien of any judgment, decree, or forfeited bond, shall be lost or impaired by the death of the party bound thereby, after the approval of this act, nor by the insolvency of his or her estate."—See Acts of 2d Called Session, p. 33.

Ray having obtained said judgment against Hicks on a debt due for borrowed money before the war, being denied the privilege of collecting it by the legislation pending the war, reposed upon this statute. Hicks, in the meantime died, and his estate was deemed amply sufficient to pay the debt, and the plaintiff, Ray, filed his bill to assert his lien given by the statute, which declared such lien should not be lost or impaired by the death or insolvency of his estate. After the bill was filed, Hicks' estate was declared insolvent, which was set up as a defense by amended answer, and the plaintiff, Ray, relying on the statutory lien, which was not, as declared by solemn legislative guaranty, to be "lost or impaired by the death of the party bound thereby, or by the insolvency of his estate," did not prove his judgment in the probate court as against said insolvent estate, and thus come into said court for a *pro rata* distribution of his effects, but reposed on his lien and the remedy he had adopted for its enforcement in the chancery court.

But the chancellor held that though the statute conferring the lien was in full force as to said judgment, (the court will see that the lien has been preserved by all subsequent legislation), yet the failure of Ray to prove his judgment, as a demand against said insolvent estate, was an extinguishment of his debt, and dismissed his bill.

This decree, we most earnestly contend, was wrong, and we insist that Ray was not bound to go into the probate court, and that as to claims, situated as this was, no presentation was necessary, and that the law requiring the presentation and proof of claims as against insolvent estates, was, by the statute above quoted, so modified as to make judgments like this, an exception to the general law.

We know, as a historical fact, that the Confederate

States forced parties, whether willing or unwilling, to engage in the military service. They were taken from their homes, *nolens volens,* and they could not be here to make affidavits and proof as to their claims, nor to protect their interest. In this condition of things, it was certainly just to them to say, that their judgments should be a lien, that this lien should not be lost or impaired, though the defendant should die, nor should it be lost or impaired though his estate should prove insolvent. There was nothing wrong, nothing unconstitutional in this, but every consideration of justice and public policy for sustaining such a measure.

Now, the bill is filed to enforce the judgment lien against the land of the defendant, which land we could have sold under execution before the party defendant died, but this privilege was denied us, and the guaranty of the lien given in lieu thereof. It may be that this denial was unconstitutional, but it serves to show the intention of the legislature, and practically it had the effect to throw us entirely upon our lien. And now, when we attempt to enforce it, we are told our remedy is lost by not going into the probate court and proving our judgment.

If we had gone into that court and proved our claim, what would have been the result? The law required that our claim, so proved, should be docketed, and stand for contestation or allowance with other claims against the estate. All we could have gotten would have been our *pro rata* share of whatever the estate would have sold for, and we would necessarily have abandoned our lien. As an indispensable pre-requisite to the settlement of the insolvent estate, the land to which, under the statute, our lien attached, must have been sold by the administrator of the insolvent estate of Hicks, and thus, our lien would have been given up; it would thus not only have been "impaired" but absolutely "lost," and we should have been turned round to our *pro rata* share of the proceeds of the land. The probate court could not regard our lien. Its duties are defined and limited to a *pro rata* distribution.—See opinion delivered by Judge Peters, 20th January, 1869.

2. The law does not require what is useless or vain. " *Lex neminem cogit ad vena seu inutilia.*"—Broom's Legal Maxims, 189 ; 3 Johns. Rep. 598 ; 5 Rep. 21 ; Co. Lit. 197, *b ;* 2 Cling. N. C. 121 ; 13 East, 420. We insist that the presentation of this claim, unless for the purpose of claiming a *pro rata*, would have been vain and useless—*cui bono*, to prove the claim, if the court, before whom the claim must be proved and filed, had no jurisdiction to determine it ? It simply resolves itself into this proposition, that we lost our debt, which was in judgment, unless we were willing to take a *pro rata*, whereas the statute said our judgment-lien should not be effected—should not be " lost or impaired " by the death of the defendant or the insolvency of his estate.

It seems to us that nothing is clearer than that if we proved our claim and went with it into the probate court as a claim against an insolvent estate, we waived our lien ; for the law requires all the property of the insolvent to be sold, and the court to make a distribution of the proceeds among the creditors. If we had gone into that court, this would have been the inevitable result. If such requirement was peremptory upon us, then it is clear, that the lien is not only "impaired " by the insolvency, but it is utterly destroyed, whereas, the act says " it shall not be lost or impaired by the death of the party or the insolvency of his estate."

The proceeding is similar to that of insolvency under the bankrupt law, in which, if a creditor holding a lien, by mortgage or otherwise, proves his demand against the bankrupt's estate, he abandons his lien.—See James on Bankruptcy, pp. 93, 94, 98.

The statute requiring demands to be proved and filed within nine months after an estate is declared insolvent, was designed to bring in all parties who claimed a dividend in the fund. It was not designed to destroy liens which the probate court could not enforce, and as to which it had no jurisdiction. If a lien had been acquired in the life time of the defendant by the levy of an execution upon his goods, it would hardly be contended by any one, that the complainant must abandon his lien, give up the prop-

erty seized, and go into the probate court to get, it may be, ten cents in the dollar. But he may compel the sheriff to complete execution by sale of the property, notwithstanding the death or insolvency of the party. Why? Simply because the lien so acquired, is not lost or destroyed by the death or insolvency of the party. Just so here. Our lien continues unaffected by the death or insolvency of the party. The statute requiring proof and presentation of claims against an insolvent estate, as we have said, was designed simply to apply to claims upon which the court was called to adjudicate and to apportion the assets to. It makes no provision for the proof of claims *sub modo*, or for any other purpose. If we had proved our debt, we could not have alleged that we proved it simply to prevent the bar of the statute, but not to come in as against the insolvent estate for a share of the assets. No such authority is given by the statute. It is precisely like the bankrupt statute. If we prove at all, it is for the purpose designed by the statute, that we may get our dividend, and if, therefore, we prove at all, we surrender our lien, as we cannot go in, as a general creditor without a lien, and share *pro rata* in all the assets, and then insist that a large part of the assets should be exclusively devoted to our benefit, so as to pay all our debt.

The case of *Haxton v. Corse*, 4 Edw. Chan. Rep. 585, is is in point to show the correctness of the above propositions.

If the legislature had intended that such judgments, having such liens, should be brought into the probate court and proved in that court, it would have provided that court with the means of preserving and making such liens effectual. It would have given that court power to have ordered a sale to satisfy the liens, and then have let the plaintiff in the judgment in, to prove for what remained unpaid, and to take his *pro rata* share in the remainder. But there is nothing of this sort provided. The truth is, and it is respectfully submitted, this honorable court must so decide, that this special law, giving a lien not to be lost or impaired by the death or insolvency, takes judgments which are given such liens out of the ordinary statutes of

non-claim as to insolvent estates. The claim of the judgment creditor, which is not proven and presented against an insolvent estate within the time prescribed by law, is forever barred as against sharing in said insolvent estate, shall not have any *pro rata* dividend thereof; but the lien which such claim has for its payment outside of such insolvent settlement, and which the statute says, shall not be lost by the death or insolvency of the estate, remains unaffected.

We have alluded to the analysis of the bankrupt decisions. We find a case in principle, which is directly in point, viz: In *Bodwich Fire Insurance Company v. James Jackson*, 12 Gray's Mass. 114, the statute gives the company a lien on the buildings insured, and land under the same for the payment of the deposit note given for the premium. Jackson, after giving the note and effecting his insurance, was regularly discharged from all his debts under the insolvent laws of Massachusetts. And the question there, as here, came up, whether the lien was not gone under this general discharge from all debts.

The supreme court of Massachusetts held, that while Jackson's certificate of discharge from all his debts, and consequently from this, as against him was operative, it did not destroy the lien, and that a decree in a modified form, should be rendered, specially authorizing the sale of the property to which the lien attached, but no other property. This, we think, was right and what we contend for in this case.

The true rule of interpretation of statutes, requires that the court must give effect to the last statute which repeals so much of former statutes as are inconsistent with it. We hence conclude, that if the proof and presentation of this claim to the probate court would have put us into that court for a *pro rata*, and have amounted to an abandonment of our lien, we were bound to keep out of it, and that if the statute giving and preserving the lien unaffected by the death or insolvency of the defendant, means anything, our right is preserved, and we have a perfect right in equity to make our lien available.

With all respect for what this court may decide, we sub-

mit that the statute thus giving parties the right to repose
upon the solemn assurance and guaranty of the legislature
for the preservation of his rights, should not be allowed
to be frittered away by technicality, by a failure to comply
with what, at most, would have been a vain and useless
formula, presentation, and proof before a court that had.
no jurisdiction to hear or determine, and which presenta-
tion and proof could not have availed any thing in any
other court, or subserved any valuable purpose under the
sun.

The land remains unsold. It is subject to our judgment
upon the express words of the act, our lien not having
been lost or impaired by the death of Hicks or insolvency
of his estate, and we ask this court to render the decree
which the chancellor should have rendered, ordering the
land to be sold to satisfy our judgment. We may grant,
that the judgment is forever barred in the probate court as
against the insolvent estate ; that it is dead, extinguished,
&c., &c., yet the lien on the land liveth, or the statute is a
trap, a snare, a delusion. But it is good and just, and
should be enforced. "*Lex magis valeat quam pereat.*"
If our lien, thus solemnly assured by legislative enactment,
sustained by all the analogies of bankrupt estates, by the
decisions of this court in *Roper v. McCook*, 7 Ala. 323 ;
*DuVal's Heirs v. McLoskey*, 1 Ala. 708, and *Inge v. Board-
man*, 2 *ibid*, 331, and the case from Massachusetts in Gray's
Rep., and by the act itself, declaring that death or insol-
vency shall not impair it,—I say, if we are to lose it for
failing to start in a court that could possibly give us no
relief, for failing to do a useless thing, then I confess the
legal profession may long hesitate before they venture an
opinion to a client on statutory law.

WATTS & TROY, for appellee.—1. The lien claimed by the
complainant under the statute of 1861, was repealed by the
act of 1863, so far as death and insolvency of estates were
concerned.

2. The failure to file the claim in the probate court, within
nine months after the declaration of insolvency, forever
barred the claim. This failure to file in the probate court,

under the statute, prevented the claim from any longer being a *subsisting* claim against the estate.

3. The *lien* is only an incident to a *subsisting claim*—undischarged judgment. Whenever the judgment was *discharged*, was no longer a subsisting claim, the lien fell with it. There can be no shadow when the substance which makes it is destroyed.

4. The statute as to insolvent estates is very different from the old one before 1851, and the old authorities holding that a lien is good after a bar of the statute of limitations is completed, can not apply to such a case as this.

5. Before the statute of 1861, giving a lien in the peculiar terms, the death of defendant and insolvency of the estate, discharged all liens created by law.—*Jones et al. v. Burn's Adm'r*, 13 Ala. 167.

6. These old decisions are recognized as valid, under the statutes in the Code of 1851.—*See Lamar v. Gunter*, 39 Ala. 324; *McEachin v. Reid*, 40 Ala. 410.

7. The act of 1861, on which this lien is attempted to be sustained, was made in aid of the Confederate States, in the war against the United States; and was therefore contrary to the policy of the United States government, and in direct hostility to the United States government, and was therefore void. No rights could grow out of a void statute.

8. The act of 1861 was in violation of the constitution of the United States and of the Confederate States, in that it impaired the obligation of contracts. It was, in fact, a stay law—and no rights accrued to the complainant under such a law.

9. We concede that the acts of the legislature of Alabama, passed during the war, in conformity to the constitution of the State and that of the Confederate States, must be regarded as those of a *de-facto* government. And as to all questions arising under them, these statutes are as binding on the present rulers and courts of Alabama, as if they were passed by the legislature of a State strictly *de jure*, as well as *de facto*.

The case of *Stone, Adm'rs, v. Watson and Wife*, 40 Ala. 451, is, in the judgment of the writer of this brief, unan-

swerable. The authorities cited there, (Phillimore and others,) trace the history of such doctrine from the time of Alexander's conquest of Greece, to that of Napoleon's conquest of Hesse Castle, and are conclusive on the subject.

By the Code of 1851, (old Code), a judgment created no lien. It was the delivery of the *fi. fa.* to the sheriff which created the lien. The old law before the Code of 1851, even in reference to judgments then in existence, was held to be repealed in *Burk v. Daily*, 28 Ala., and this case is approved in *Curry v. Landers*, 35 Ala. 280. Thus stood the law until the statute of 1861, (December 10th, 1861.) This statute gives a lien to all judgments and decrees, of all courts of record and of justices of the peace, on all property owned by a defendant in execution, at the time of the passage of this statute, except crops and property which is consumable in its use, including all live stock, notwithstanding the death of the defendant, or insolvency of his estate.—See Acts of 1861, p. 33.

The language of this statute is, that " the lien of any judgment, decree, or forfeited bond, shall not be lost or impaired by the death of the party bound thereby after the approval of this act, nor by the insolvency of his, or her estate."

By the act of December 8th, 1863, the act of December, 1861, is repealed.—See Acts of 1863–4, p. 55. But it is declared, that " all liens on judgments, decrees and forfeited bonds acquired under said act, (of 1861), be and the same are hereby preserved and maintained, and not in any word (wise ?) affected by the repeal of said act, or any provisions contained in this act, except as hereinafter provided."

Now, if this language is printed correctly, no liens of judgments, decrees, &c., are preserved except such as had been, by the act of 1861, acquired on judgments, decrees, and forfeited bonds, (which last are statutory judgments.)

It must be remembered, that a lien was given by the act of 1861, on all property except crops and property which is consumable in its use. Property, before that time exempt from sale under legal process, was not by the terms of the act of 1861, exempt from the liens therein declared. All property includes choses in action, judgments, decrees and forfeited bonds, and every other species of property.

The lien by the statute of 1861, attached to all property, except crops and such as is consumable in its use, including live stock. This lien, therefore, attached to judgments, decrees and forfeited bonds, &c., as property belonging to a defendant in judgment.

But, suppose the word " on " to be a mistake for " of, " and that the original act on file in the Secreatary of State's office would show this, still, we must see how the liens preserved by the section of the act of 1863, are affected by its subsequent provisions ; for they are " not affected except as hereinafter provided." How far, then, are they affected by the subsequent provisions of the act of 1863 ? We shall best answer this question by an analysis of its subsequent provisions, bearing on this subject.

By the 3d section of the act of 1863, if the plaintiff in any judgment, decree, &c., refuse to receive Confederate treasury-notes, his interest is lessened and he loses the lien therefore given by law to executions. Is this the lien spoken of and preserved in the first section of the act ? We think not. The lien spoken of in the 1st section of the act, is one given to judgments, &c., by the law of December, 1861, and not one given to executions. The lien given by law to executions, is that found in the Code of 1851, (old Code.)

The only other sections of the act of 1863 bearing on this subject, are the 5th and 6th sections. The 5th section covers the whole subject of lien. It does not confine its operative effect to the present, or to the future ; but it enters the whole past. It declares that " all judgments and decrees now existing in any court of record in this State, or which may hereafter exist, shall be and operate as a lien upon all property of the defendant, or defendants therein, from the date of their rendition, except such property as may be exempt from levy and sale under legal process in this State for the benefit of families.

It will be observed, that this language gives no lien to judgments rendered by justices of the peace. The statute of 1861 expressly named judgments rendered by justices of the peace. Will it be said that the liens acquired under the act of December, 1861, by such judgments continued,

after the passage of the act of December 8th, 1863 ? If not, why not ? It must be, because this section fails to provide any such lien ; and covering, as it does, the whole subject of lien, past, present and future, necessarily repeals all liens not "provided for" by it, or some subsequent section of the act.

It will also be observed, that judgments, &c., have liens under this section, not from the day of the passage of the act, but from the date of the judgments, &c.

Now, under the act of December, 1861, all judgments, decrees, &c., had an equal lien in point of time. A judgment rendered in 1859, had no better or older lien than one rendered at any time in 1861, before the 10th of December, 1861. But by the terms of the 5th section of the act of 1863, judgments and decrees rendered in 1861 have no lien as against those rendered before. The lien by statute of 1861, was, to all existing judgments, &c., equal liens, and the older judgment had no greater or better lien than the younger. The lien given by statute of 1861 to the younger judgments, &c., is, as against the older judgments against the same defendant, repealed, and the younger judgment made subordinate to the older, which has the prior lien by virtue of its age ; for under the 5th section of the act of 1863, the judgments have lien from their dates of rendition.

It will also be observed, that the 5th section of the act of 1863, gives no lien to forfeited bonds. The act of 1861 did.

It will be also observed, that the lien declared in the 5th section of the act of 1863, operates on all property of the defendant, except such property as may be exempt from levy and sale under legal process for the benefit of families.

The statute of 1861 exempts crops and property which is consumable in its use, including all live stock, and does not exempt any of that which is exempt from sale under legal process, unless it is included in crops, or property which is consumable in its use. Can it be truthfully said that the liens acquired under the act of 1861, by judgments rendered before December 10th, 1861, and between the 10th December, 1861, and the 8th December, 1863, on property which was by the general law, exempt from sale for the use

of families, still continued after the act of December, 1863 ?
Certainly not! If not, why not? It must be because the
5th section of the act of December, 1863, covering, as it
does, the whole subject of liens, repeals the act of 1861,
and destroys, " affects" the liens given by act of 1861, (as
" provided" in the section preserving the liens,) *quo ad hoc.*

Under the 5th section of the act of 1863, liens are given
to all judgments and decrees of courts of record, on "crops,
and on property consumable in its use," on all property of
the defendant, except alone, property exempt from levy
and sale by legal process for the use of families. And this
lien is, by the terms of this section of the act, to commence
from the day of the rendition of such judgments and de-
crees. The language is broad enough to give a lien on the
live stock, crops, which had been owned by the defendant
in the judgment or decree, from the time of the rendition
of such judgment or decree. Thus we see, that the section
5th of the act of 1863, uproots and repeals all liens given
by act of 1861, except those preserved and provided for by
the 5th section of this act.

The 6th section of the act of December, 1863, is singu-
lar and curious in its language. It declares, that " if the
defendant in any such judgment, decree or forfeited bond,
shall tender payment, in current bank notes, Confederate
treasury-notes, or State treasury-notes, and the creditor
shall refuse to receive them at par value, the lien of such
judgment, decree or forfeited bond, and of all executions
thereon, shall be thereby discharged and prevented."

. Such judgment and decree refers to the immediately
preceding section of this act, viz : the 5th section. There
is no forfeited bond named therein.

This 6th section also draws a distinction between the
lien of judgments, decrees, and the lien of executions
thereon. This shows that the legislators had in their view,
when they used the term, in the 3d section of the act of
1863, " lien heretofore given by law to executors ;" the dis-
tinction between the lien of judgments and decrees, and
the lien created by the delivery of executions to officers for
execution. And hence, the true construction of the 3d sec-
tion is, that by refusal to receive Confederate money, the

only lien lost, was that, therefore, given by law to executions when delivered to officers.

From this analysis of the act of 1863, it will be seen that the legislators intended to remodel the whole subject of liens, and only to preserve those provided for in the sections of the act subsequent to the 1st section which expressly repealed the act of 1861.

The 5th section of the act of 1863, is utterly inconsistent with the act of 1861, and the liens given thereby. The former gives a lien from the date of the judgment; the latter from the date of the law. These two cannot stand together. Wherever this is the case, the last repeals the first.

In the 5th section of the act of 1863, no lien is given or preserved after the death of defendant or insolvency of his estate. Can it be possible that the legislature intended that judgments and decrees rendered before the 8th of December, 1866, should have liens, notwithstanding the death of the defendant and the insolvency of the estate ; and that no such lien should attach to judgments and decrees rendered after the 8th of December, 1863 ? There was as much reason for the lien to be preserved to judgments rendered after as before the 8th of December, 1863, the date of the passage of the law of 1863.

The only solution to this difficulty, is to hold that the 5th section of the act of 1863 was intended to cover the whole ground of liens, and that none should be held good except those declared in that section of the act, and that inasmuch as it does not preserve or maintain any lien after the death of the defendant, or after his estate was declared insolvent, none was intended to be preserved or maintained. The lien, after death of defendant and insolvency of his estate, is not provided for by this 5th section of the act of 1753 ; and the lien was intended to stand, as to death and insolvency, just as it did before the law of 1861, and, consequently, it no longer existed after the law of December, 1863.

The insolvent laws, which give equality to creditors, except for funeral expenses, last sickness, &c., was thus restored. Equality is equity and justice in such cases.—See

*Bush, Adm'r, v. Jones & Allen,* 13 Ala., and authorities there cited ; *Lamar v. Gunter,* 39 Ala. ; *McEachin v. Reid,* 40 Ala.

PETERS, J., (after stating facts as above.)—The law, as it is found in the Code of 1852, makes a *fieri facias* a lien only in the county in which it is delivered to the officer for execution, on the lands and personal property of the defendant, subject to levy and sale, from the time it is received by the person commanded to execute it. This lien continued as long as the *fi. fa.* was regularly issued without the lapse of an entire term. And this was the case, though the defendant should die after judgment, and after the writ came into the officer's hands ; unless the estate of the defendant was declared insolvent by the probate court in regular course of administration. In this latter event, this lien was dissolved. And a party having a debt in judgment against an insolvent estate, was compelled to seek his remedy for its payment in the court of probate, upon a distribution of the insolvent's estate amongst his creditors, *pro rata.* This was the settled law up to the event of secession.—Revised Code, §§ 2872, 2275 ; *Edwards v. Gibbs,* 11 Ala. 202 ; *Burk's Adm'r v. Jones & Allen,* 13 Ala. 167 ; *Fitzpatrick v. Edgar,* 5 Ala. 499 ; *Hale, Adm'r, v. Cummings & Spyker,* 3 Ala. 398 ; *Lamar v. Gunter,* 39 Ala. 324 ; *McEachin v. Reid,* 40 Ala. 410 ; *King v. Kenan,* 38 Ala. 63 ; *Curry v. Landers,* 35 Ala. 280 ; *Dailey v. Burke,* 28 Ala. R. 328.

During the late rebellion, an enactment was passed by the legislature of the rebel government then having military control of the State, which purports to have been approved on the 10th day of December, 1861, by which the then existing judgments, and judgments thereafter rendered in all the courts of the State, were made liens on the property of the defendants therein. By this enactment, it was declared, that " no lien of any judgment, decree, or forfeited bond, shall be lost or impaired by the death of the party bound thereby, after the approval of this act, nor by the insolvency of his or her estate."—Pamph. Acts, 1861, No. 33, p. 33, § 1. And again, in 1866 a second enactment

was passed by the legislature then acting as the general assembly of this State, which purports to have been approved on the 20th day of February, 1866, which repeals the enactment of the 10th of December, 1861, with this *proviso:* "Provided, that this act shall not so operate as to repeal or destroy any lien of any judgment, decree, or execution now in existence."—Pamp. Acts, 1865–66, No. 57, pp. 81, 86, § 9. The Revised Code makes judgments of the courts of record in this State, existing on the 19th day of February, 1867, liens on all the property of defendants therein, which is subject to levy and sale; and it preserves the liens of all judgments, decrees or executions in existence on the 20th day of February, 1866.—Revised Code, §§ 2876, 2877. The Revised Code, with certain modifications, has been adopted by the present State government as the law of the commonwealth.—Act approved July 29, 1868, Pamph. Acts, 1868, p. 7. By this Code, "all acts of a public nature, designed to operate upon all the people of the State, and not embraced in this Code, are repealed, unless otherwise directed in this Code."—Revised Code, § 10. So much, then, of the enactment of the 10th of December, 1861, as has been above quoted, the same not being embraced in the Revised Code, is repealed. If, indeed, it ever had any such legal validity as can be recognized in this tribunal, as now constituted, of which there are well founded and grave doubts, no such validity can now be given to it. The lien of a judgment is a right given by law, and it depends upon the law creating it. This law may be repealed, and when it is so repealed, the lien that depended upon it falls with it. The lien here insisted on can not, therefore, now derive any aid from this enactment. Nor is it supported by the law as it stood before the event of secession, because execution has not been regularly issued, as the law then required.—Revised Code, § 2875; *Fitzpatrick et al. v. B. & W. Edgar,* 5 Ala. 499, 503; *Walson & Simpson v. Simpson,* 5 Ala. 233. The lien which is preserved by the Revised Code is the lien of the judgment without this privilege of immunity from its loss, or its being impaired by the death of the defendant in the judgment, or the insolvency of his estate. If this privilege is gone, then the lien

must be kept in force like that of any other judgment, whether the defendant be alive or dead; and it fails for the same reason, that that of any other judgment would fail, while the defendant was still living. This being so, the lien of this judgment failed when the judgment itself failed. The judgment is the principal thing, and the lien but a " qualified right " depending on it.—5 Ala. 499, 503. Moreover, the judgment was a claim against the deceased defendant, which, like any other claim, became extinct, or was " forever barred," unless it was regularly presented to the administrator, or filed in lieu of presentation, as required by law; or, in case of the insolvency of the estate, it became barred by effect of the statute of non-claim, unless it is verified and filed, as is required by the statute, in case of any other claim.

This construction leaves all the statutes upon the subject of the administration of decedent's estate in harmony with each other. It does not require that one section shall suspend or constructively repeal another; and it leaves all the creditors of such estate upon an equal footing, except those who have preferred claims. And in this case, equality is justice, and justice is equity. And besides, it may be said that this construction also harmonizes with the former decisions of this court on similar questions.—Revised Code, § 2196; *Murdock v. Rousseau's Adm'r*, 32 Ala. 611; *Hale's Adm'r v. Cummings et al.*, 3 Ala. 398; *Bell's Adm'r v. Andrews*, 34 Ala. R. 538; *Puryear v. Puryear's Distributees*, 34 Ala. 555; Revised Code, § 2239; *Kinney v. Mallory*, 3 Ala. 626. The bill is devoid of equity. The effect of the decree of insolvency is to transfer to the court of probate the exclusive jurisdiction of all claims against the estate, and upon final settlement that court has full power to adjust them when they are merely legal demands, as is the case with the claim in this instance.—*Edwards v. Gibbs*, 11 Ala. 292; Revised Code, §§ 2205, 2206, 2208, 2209, 2211.

The decree of the chancellor, being in conformity with these views, is affirmed; and the appellant, and his security on his appeal bond, will pay the costs of this appeal in this court, and in the court below.

NOTE BY REPORTER.—The foregoing opinion was delivered at the January term. On a subsequent day of the term, appellant applied for a rehearing. The application was held under advisement until the June term, when the following response was made thereto.

PETERS, J.—In this cause the appellant, Ray, petitions the court for a rehearing. In his application here, as in the original case, he bases his right on a certain enactment of the rebel organization holding military control of the territory of this State during that part of the year 1861, after the 11th day of January, until its close. The enactment referred to is known as "An act to regulate judicial proceedings," which purports to have been approved December 10th, 1861.—Pamphlet Acts, 1861, No. 33, p. 42, *et seq.* So much of this act as has relation to this case, is quoted in the opinion, now sought to be reviewed.

In that opinion, it was intimated that the act relied on was unlawful, and, consequently, without validity. Since then, the decision of the supreme court of the United States in *Texas v. White et al.*, leaves this question no longer doubtful. To use the language of the chief-justice, speaking for the court in that important case, "the legislature of Alabama, at the time of the passage of the act referred to, constituted *one* of the departments of a State government established in hostility to the constitution of the United States, and cannot be regarded, therefore, in the courts of the United States as a lawful legislature, or its acts as lawful acts." The decision in that case turned upon that very principle. What happened in Texas, happened also in this State during the late rebellion. If a law of the insurrectionary government of Texas was invalid, *because* it was passed by a legislature, which, at the time of its passage, "constituted one of the departments of a State government established in hostility to the constitution of the United States;" for like reason, a law similarly passed, must be invalid in this State. This is the case with the act of 10th December, 1861, to "regulate judicial proceedings." It is an unlawful act, and is, therefore, invalid.— *Texas v. White et al.*, January term supreme court of the

U. S.; *Reynolds, Auditor, v. Taylor,* June term supreme court of Alabama.

But, besides this, the act referred to bears upon its face the plain expression of a purpose to give aid and comfort to those inhabitants of this State, who, at the date of its passage, were engaged in carrying on war against the government of the United States, in order to destroy the Union. This purpose was traitorous and illegal. In the case of *Shortridge & Co. v. Macon,* in the United States circuit court for North Carolina, decided at Raleigh, on the 17th day of June, 1867, *Chief Justice Chase,* who delivered the opinion of the court, says : " War, therefore, levied against the United States by citizens of the republic, under the pretended authority of the new State government of North Carolina, ,or the new central government which assumed the title of the ' Confederate States,' was treason against the United States."—Pas. An. Con. U. S., p. 211. This unlawful purpose appears from the 2d, 3d, 4th, 5th, 6th, 7th, 8th, 9th, 13th and 14th sections of said unlawful act. The 2d section of this act authorizes the defendants, in judgments invested with the peculiar lien, supposed to be acquired under said act, to " tender " payment of such judgment in " bonds or treasury-notes of the Confederate States, and compels the creditor to receive such bonds or notes at their par value, or the lien insisted on is " discharged or prevented." The whole act is an attempt to force the circulation of the " bonds and treasury-notes " of the so-called Confederate States upon the people of this State, for the purpose of aiding the prosecution of the war of the rebellion against the United States government. The whole act is therefore tainted with an illegal and unconstitutional purpose. This would make it utterly void, were it not otherwise wholly without any legal force as a law. And if the 1st section escapes this patent purpose, manifested in the other sections, it falls under another law equally fatal to its honest repute. *Nocitur a sociis.* It is caught in bad company; and it is not wholly free from the leprosy of disloyalty which infects its friends. It was an enactment hostile to the government of the United States, and no right which

can be recognized in this tribunal, can be founded on it.— *Shortridge & Co. v. Macon, supra.*

The dissolution of the lien of judgments by the death of the defendant, and the insolvency of his estate, is an old doctrine of the courts of this State. We are not aware that it has ever been seriously questioned, until at present, by the eminent counsel for the appellant. The authorities cited in the main case, we think, clearly show this. It has also been long settled that judgments are barred by the statute of non-claim, if they are not properly presented as the law requires, of all claims against an insolvent estate.—*Ready, Adm'x, v. Thompson, Adm'r,* 4 S. & P. 52.

But beyond this objection to a rehearing, it may be very seriously questioned, whether the judgment of Ray is worth more than the law, upon which he bases his lien to secure its payment. The judgment was rendered on September the 12th, 1863. It is known to the court as a part of the judicial history of the State, that the court in which this judgment was rendered, constituted a portion of "*one* of the departments of a government established in hostility to the constitution of the United States." It has been settled that the acts of the legislature of such a government are invalid.—*Texas v. White et al., supra.* If this is admitted, and it seems to me that it cannot be denied, it cannot well be conceived how the judgments of the courts of such a government can be better or more valid than its laws. The reasons which invalidate the one, assail the other also. Both are but parts of a whole; and if the whole is bad, as a general principle, the parts cannot be good.

Whether such judgments have been validified, or can be validified as judgments, by any legislative enactments of the rightful government since its restoration, is yet an open question in this State. They are, beyond all doubt, the judgments of the courts of a hostile, unlawful, and traitorous organization, by whatever name or title it may be called. The legislative, the judicial, the executive, and the military departments of the supreme government, have all proclaimed this in language not to be mistaken or denied. And the rightful government of this State, since its restora-

tion, has done the same.—*Texas v. White et al.*, *supra*; *Shortridge & Co. v. Macon*, *supra*; Paschall's Ann. Const. U. S., p. 211; *Coleman v. Chisholm*, January term, 1869, of this court; *Reynolds v. Taylor*, *arguendo*, at the present term; President Johnson's proclamation, May 21, 1865; Reconstruction act of Congress, March 2, 1867, Statutes, at Large; Governor Patton's proclamation, February 13, 1866.

The court, without assenting to all the reasoning of this opinion, concur in the result. The rehearing is, therefore, refused, at the cost of the appellant, Ray.